**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 13-cv-02664-REB-NYW

JOSHUA C. JOHNSON,

      Plaintiff,

v.

GEORGE SANTINI,
ALICIA VINEYARD,
T.K. COZZA RHODES,
PETER BLUDWORTH,

      Defendants.

---

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

---

Magistrate Judge Nina Y. Wang

      This civil action comes before the court on Defendants George Santini, Alicia Vineyard, T.K. Cozza-Rhodes, and Peter Bludworth's (collectively, "Defendants") Motion for Summary Judgment.  [#55, filed November 3, 2014].  This matter was referred to this Magistrate Judge pursuant to the Order Referring Case dated December 3, 2013 [#11], the memorandum dated November 3, 2014 [#56], and the Order of Reassignment dated February 9, 2015 [#83].  After carefully considering the Motion and related briefing, the entire case file, and the applicable case law, I respectfully RECOMMEND that Defendants' Motion for Summary Judgment be GRANTED.

**PROCEDURAL HISTORY**

      Joshua C. Johnson ("Plaintiff" or "Mr. Johnson"), is a prisoner in the custody of the Federal Bureau of Prisons ("BOP") who was incarcerated at the Federal Correctional Institution

in Florence, Colorado ("FCI Florence") when the events giving rise to this lawsuit took place. Plaintiff initiated this action on September 30, 2013 by filing *pro se* a complaint for money damages and injunctive relief pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). [#1].  On October 10, 2013, he was granted leave to proceed *in forma pauperis* pursuant to 28 U.S.C. § 1915. [*See* #4].  That statute and the Local Rules of this District require a court to evaluate a prisoner complaint and dismiss *sua sponte* an action at any time if the action is frivolous, malicious, or seeks monetary relief against a defendant who is immune from such relief.  28 U.S.C. § 1915(e)(2)(B); D.C.COLO.LCivR 8.1(b).  Pursuant to court order directing him to clarify the personal participation of each named Defendant with respect to his allegations, Plaintiff filed an Amended Complaint on November 22, 2013, naming Defendants and asserting three claims for deliberate indifference to his medical needs in violation of the Eighth Amendment. [#8]. The following recitation of facts is taken from Mr. Johnson's Amended Complaint.

Plaintiff suffers from a rare, congenital neurologic disease known as Charcot-Marie Tooth ("CMT").  [*Id.* at 3a].  He claims that Defendants, in their individual capacities, acted with deliberate indifference to his serious medical needs by denying him adequate pain medication, physical therapy, transfer to a BOP medical facility, and orthopedic surgery with an outside specialist.  Plaintiff seeks prospective injunctive relief in the form of foot surgery, access to physical therapy or transfer to a medical facility that provides such therapy, and proper pain management.  [*Id.* at 17].  He also seeks compensatory damages in the amount of $100,000.  [*Id.*] By letter dated July 8, 2014, Plaintiff informed the court that he had been transferred to Springfield Medical Center in Springfield, Missouri, where he is currently housed.  [#40].

Following an extension of time to respond to the Amended Complaint, Defendants filed a Motion for Summary Judgment on April 30, 2014. [#27]. On August 21 and 28, 2014, Plaintiff requested extensions of time to respond to the Motion because he did not possess the documents necessary to formulate a response. [#41, #43].

On September 2, 2014, Magistrate Judge Boland denied Defendants' Motion for Summary Judgment without prejudice and ordered them to file an Answer [#44], which they filed on September 11, 2014 [#45]. Judge Boland held a Preliminary Scheduling Conference on October 22, 2014, at which he entered a Scheduling Order directing the Parties to complete discovery by April 22, 2015 and file dispositive motions on or before May 22, 2015. [#54].

Defendants thereafter filed the pending Motion for Summary Judgment. [#55]. Defendants also filed a Motion to Stay Discovery until after disposition of the Motion for Summary Judgment arguing they should not be burdened with pre-trial discovery until the court ruled on their qualified immunity argument. [#57]. Judge Boland denied the Motion to Stay on November 4, 2014 [#61], and Defendants filed an objection to that Order on November 17, 2014. [#65]. Discovery proceeded.

On December 15, 2014, Defendants moved for an extension of time to respond to Plaintiff's first set of written discovery requests. [#72]. The court granted the motion and ordered Defendants to respond to the requests on or before January 14, 2015. [#74]. Defendants moved for an extension of time to respond to Plaintiff's second set of discovery requests on January 30, 2015. [#80]. The court granted the motion and ordered Defendants to respond to the requests on or before March 4, 2015. [#82]. This action was reassigned to the undersigned Magistrate Judge for pretrial matters on February 9, 2015. [#83].

On February 23, 2015, Plaintiff sought an extension of time of 80 days to respond to the Motion for Summary Judgment on the basis that the court had granted Defendants leave to produce responses to his discovery requests on or before the day his Response to the Motion for Summary Judgment was due and he required those discovery responses in preparing his Response. [#84]. The following day, this court granted Plaintiff's request in part, and ordered that he file his Response on or before April 3, 2015. [#86].[1]

On March 23, 2015, Plaintiff filed a "Motion for Reconsideration to Defer Summary Judgment Until Discovery Has Been Provided and Motion to Compel Discovery" [#87], along with a declaration attesting that certain facts are unavailable to him. [#88]. Plaintiff asked the court to order Defendants to produce materials sought in his requests for production, order Defendant Santini to respond to the second set of Interrogatories, and "defer the summary judgment proceedings" until after the discovery issues had been resolved and the requested items produced. Defendants filed a Response on April 6, 2015, detailing the various extensions that Plaintiff has received and asserting that as individual government employees, Defendants did not have the discovery Plaintiff sought. [#93]. On April 17, 2015, this court granted the Motion for Reconsideration in part and denied it in part. [#94]. Specifically, the undersigned Magistrate Judge ordered Defendant Santini to respond to certain interrogatories propounded by Plaintiff, instructed Plaintiff to serve a subpoena on the BOP or file an appropriate request pursuant to the

---

[1] Plaintiff subsequently filed a Motion to Recuse, accusing the undersigned of bias because "as recent as January 10, 2014, Nina Y. Wang served as one of the LEAD ATTORNEYS for the United States Attorney's Office in Denver, Colorado where she represented parties employed by the Bureau of Prisons in the case of 'Wallace Mitchell v. Kevin Estrada et al.' 2014 U.S. Dist. Lexis 2989 Civil Action No. 03-CV-00387-PAB-MJW." [#91]. Plaintiff concluded that I favored Defendants because I once represented the BOP and had previously worked with counsel for Defendants. This court denied Plaintiff's Motion to Recuse on May 8, 2015. [#95].

Freedom of Information Act on or before May 15, 2015, and extended Plaintiff's deadline to respond to the Motion for Summary Judgment up to and including July 6, 2015. [*Id.*]   As of the date of this Recommendation, Plaintiff has not filed a Response to the Motion for Summary Judgment despite repeated extensions of time.

### STANDARD OF REVIEW

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Henderson v. Inter–Chem Coal Co., Inc.,* 41 F.3d 567, 569 (10th Cir. 1994).   "A 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'"   *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 249 (1986)).   Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or conversely, is so one-sided that one party must prevail as a matter of law.   *Anderson,* 477 U.S. at 248–49; *Stone v. Autoliv ASP, Inc.,* 210 F.3d 1132, 1136 (10th Cir. 2000); *Carey v. U.S. Postal Service,* 812 F.2d 621, 623 (10th Cir. 1987).   A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable party could return a verdict for either party. *Anderson,* 477 U.S. at 248.   "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"   *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat. Bank of Ariz. v. Cities Service Com*, 391 U.S. 253, 289 (1968)).

In reviewing a motion for summary judgment the court views all evidence in the light most favorable to the non-moving party. *See Garrett v. Hewlett-Packard Co.,* 305 F.3d 1210, 1213 (10th Cir. 2002). "Although [o]ur summary judgment standard requires us to view the facts in the light most favorable to the non-moving party[,] it does not require us to make unreasonable inferences in favor of the non-moving party." *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1276 (10th Cir. 2008) (quoting *Starr v. Downs*, 117 Fed. Appx. 64, 69 (10th Cir. 2004)). When, as here, the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying "a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 671 (10th Cir. 1998) (citation omitted). *See also Anderson*, 477 U.S. at 256 (The nonmovant "may not rest upon mere allegation or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial."). Conclusory statements based merely on speculation, conjecture, or subjective belief are not competent summary judgment evidence. *See Bones v. Honeywell Int'l, Inc.,* 366 F.3d 869, 875 (10th Cir. 2004). Because Mr. Johnson failed to file a Response to the Motion for Summary Judgment, the court deems the properly supported facts offered by Defendants as true. See Fed. R. Civ. P. 56(e)(2); *Lammle v. Ball Aerospace & Techs. Corp.*, Case No. 11-cv-3248-MSK-MJW, 2013 WL 4718928, *1 (D. Colo. Sept. 1, 2013). In doing so, however, this court has reviewed the entirety of the exhibits submitted by Defendants to ascertain the context of their statements. The court may not enter summary judgment unless Defendants carry their respective burdens under Rule 56 of the Federal Rules of Civil Procedure. See Reed v. Bennett, 312 F.3d 1190, 1194-95 (10th Cir. 2002).

"A *pro se* litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (citing *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972)). "The *Haines* rule applies to all proceedings involving a *pro se* litigant, including … summary judgment proceedings." *Id.* at n. 3 (citations omitted). However, the court cannot be a *pro se* litigant's advocate. *Yang v. Archuleta*, 525 F.3d 925, 927 n. 1 (10th Cir. 2008). Against this legal backdrop, the court now turns to Defendants' pending Motion for Summary Judgment.

## FACTUAL ALLEGATIONS

CMT causes muscle imbalances and can lead to deformities. The progression of Plaintiff's disease has caused his right foot to angle grossly to the side and is accompanied by significant pain. [#8 at 5]. Plaintiff was confined to a wheelchair when he arrived at FCI Florence on February 15, 2012. [*Id.*] He met with Staff Physician Defendant George Santini ("Defendant Santini" or "Dr. Santini") soon after arrival for a medical evaluation, at which they discussed Plaintiff's condition and how it was progressing and determined that Plaintiff would seek to have his medical records transferred to Dr. Santini for review. [*Id.* at 6]. Plaintiff and Defendant Santini met again on April 12, 2012. After reviewing Plaintiff's medical file, Defendant Santini advised that he could not use the records as "substantial proof" of the CMT diagnosis, but discussed the possibility of Plaintiff receiving orthotic devices such as a Charcot Resist Orthotic Walker ("CROW") and an orthotic boot. [*Id.*] On July 8, 2012, during a third meeting, Plaintiff spoke of his pain and inquired as to whether he would undergo surgery and as to the status of the CROW and orthotic boot. Dr. Santini stated that he had not scheduled

surgery, there was no update as to the walker or boot, and he could provide only a non-narcotic pain reliever for Plaintiff. [*Id.*]

In September 2012, Plaintiff met with an orthotic specialist, Dr. Bush, who opined to Defendant Santini that Plaintiff should undergo reconstructive surgery on his foot and suggested fitting Plaintiff with the CROW while he waited for the operation. [*Id.* at 7]. During this meeting Plaintiff requested from Dr. Santini, and was denied, stronger pain medicine. [*Id.*] On November 26, 2012, Defendant Alicia Vineyard ("Defendant Vineyard" or "Ms. Vineyard"), a Mid-Level Provider, was treating Plaintiff for an unrelated issue when he asked her about the status of his surgery. She responded, "you came here with the problem you will leave with the problem." [*Id.* at 7].

Dr. Bush visited Plaintiff during the subsequent two months to fit him for the orthotic boot, and also communicated to Defendants Santini and Vineyard the importance of Plaintiff undergoing corrective surgery. [*Id.* at 7]. Plaintiff received the CROW on March 26, 2013, along with instructions to participate in physical therapy so as to properly utilize the boot. [*Id.*] Physical therapy is not provided at FCI Florence and Defendants Santini and Vineyard were noncommittal as to whether Plaintiff would receive therapy. Plaintiff nevertheless endeavored to walk with the boot, though it caused him pain and his foot to blister.

Sometime after he received the CROW, he addressed the need for physical therapy with Defendants Cozza-Rhodes and Bludworth, the Warden and Associate Warden of FCI Florence. They responded they could take no action because physical therapy is not provided at the facility and Plaintiff did not meet the criteria for transfer to a medical center. [#8 at 8].

8

Dr. Patterson, a surgeon, examined Plaintiff on May 29, 2013, and agreed that reconstructive surgery was necessary before the deformity became irreparable and amputation was required.  [*Id.*].  Dr. Patterson declined to conduct the surgery as it was outside his scope of practice, but recommended two other surgeons to the FCI Florence medical staff.  [*Id.*]  On June 4, 2013, Plaintiff was prescribed Gabapentin for nerve damage and pain management.  [*Id.* at 9].  At the time Plaintiff filed his Amended Complaint he had not undergone surgery or been examined by the two surgeons whom Dr. Patterson had suggested.

### DEFENDANTS' STATEMENT OF UNDISPUTED FACTS

### George Santini, M.D.

Dr. Santini currently serves as the Clinical Director at the Federal Correctional Complex ("FCC") in Florence, Colorado.[2]  [#55-1 at ¶ 1].  During the time relevant to Plaintiff's Amended Complaint, Defendant Santini was assigned to FCI Florence as Staff Physician.  [*Id.*]  FCI Florence is identified as a Care Level II BOP facility, which is an intermediate classification on a four-level scale.  Care Level I represents the healthiest inmates and Care Level IV represents inmates with serious health issues.  [*Id.* at ¶ 6].  If an inmate presents with a medical condition that cannot be treated within his facility or that requires extended rehabilitation or aftercare, that inmate may be transferred to a Care Level III or IV facility, which includes Federal Medical Centers.  [*Id.*]

Every institution has a Utilization Review Committee ("URC") that is chaired by the Clinical Director.  The URC reviews requests for outside medical, surgical, and dental

---

[2] FCC consists of a low security Federal Prison Camp, the medium security FCI Florence, the United States Penitentiary-High Security, and the United States Penitentiary-Administrative Maximum ("ADX").  [#55-1 at ¶ 3].

9

procedures, requests for specialist evaluations, and other services the primary care provider or Clinical Director has recommended. [#55-1 at ¶ 7; #55-2 at 7]. The URC may approve the request with or without modification, refer the inmate for further evaluation by a staff physician or specialty consult, place the inmate on a waiting list, determine the request is contraindicated or deny the request. [*Id.*] In some cases, the Clinical Director may require prior approval for certain types of cases by the Regional or Central Office Medical Directors. [#55-1 at ¶ 7]. If the URC approves the request and no additional approval is required from Regional or Central offices, a Medical Services Request is submitted for scheduling to American Correctional Healthcare ("ACH") through FCC Health Services Budgeting. [*Id.* at ¶ 8]. ACH is a contract service that arranges and schedules outside medical trips with contracted physicians for inmates housed at FCC Florence. [*Id.*] When an outside trip is scheduled, ACH uploads the consult into a computerized tracking database with instructions. Health Services Assistants then coordinate the logistics and security for the trip. [*Id.*] Defendant Santini is not authorized to schedule appointments between inmates and outside providers, nor does he oversee the contract between ACH and BOP regarding scheduling. [*Id.*]

Plaintiff arrived at FCI Florence on February 15, 2012. [#55-1 at ¶ 11; #55-2]. He was immediately examined by a BOP medical technician who noted no serious complaints. *See* [#55-1 at ¶ 11; 55-4 at 1-4]. Dr. Santini saw Plaintiff two days later and noted that Plaintiff had been diagnosed with CMT, "an inherited disorder of the peripheral nervous system characterized by distal muscle weakness and atrophy, sensory loss and slow nerve conduction velocity. It is a slowly progressive condition and often associated with foot deformity and bilateral foot drop." [#55-1 at ¶¶ 11, 12; #55-4 at 6]. Defendant Santini noted that CMT affected both of Plaintiff's

feet and that Plaintiff had been born with the condition.  [*Id.*]  Plaintiff reported that he had undergone reconstructive surgery for repair of his left foot in 1999.  [*Id.* at ¶ 13; #55-4 at 6].  He also stated he was involved in a motorcycle accident in October 2009, where a collision resulted in his right foot being run over by the motorcycle he was driving.  [*Id.*]  He had been confined to a wheelchair ever since.  [*Id.*]  Dr. Santini requested Plaintiff's medical records from his outside treatment provider, ordered x-rays of Plaintiff's feet, instructed Plaintiff to follow up at sick call as needed, and noted Plaintiff's need for an orthotics appointment for boots and a follow up visit to the Chronic Care Clinic.[3]  [#55-1 at ¶¶ 13, 14].

Defendant Santini next saw Mr. Johnson on April 12, 2012.  At that time, Plaintiff was not on prescribed medication, had lost eighteen pounds since arriving at FCI Florence, and complained of bilateral foot pain increasing over the previous year.  [#55-1 at ¶ 16; #55-4 at 11-13].  Plaintiff requested surgery on both his feet.  Dr. Santini renewed Plaintiff's exemptions, which included a lower bunk, soft shoes, and crutches.  [*Id.*]  On April 27, 2012, Defendant discussed Plaintiff's condition with an orthopedic surgeon, who recommended that an orthotist evaluate Plaintiff for boot placement.  [#55-1 at ¶ 17; #55-4 at 14-16].  The URC approved Plaintiff for a prosthetics device on June 14, 2012.  [#55-4 at 17].  Defendant Santini saw Plaintiff again on July 18, 2012 and prescribed him Naproxen for pain.  [#55-1 at ¶ 18].  On October 22, 2012, Plaintiff reported dull and throbbing pain in his right foot, and stated he was not taking the Naproxen because it did not help him and that he was purchasing ibuprofen over the counter.  [*Id.* at ¶ 19; #55-4 at 21-23].  At this time Plaintiff was also waiting for the

---

[3] Chronic Care Clinics are "a means for inmates with ongoing medical needs to be seen and monitored by a health care provider at clinically appropriate intervals.  A physician will see all inmates assigned to a CCC every twelve months or more often if clinically indicated."  [#55-1 at ¶ 11].

orthotist's recommendations regarding boot placement. [#55-1 at ¶ 19]. Defendant Santini prescribed Levetiracetam tablets for the pain. [*Id.*]

Plaintiff saw orthotic specialist, Todd Bush, on January 24, 2013. [#55-1 at ¶ 20; #55-4 at 24]. Mr. Bush is not a medical doctor, nor is he a surgeon who can make surgical recommendations. [#55-1 at 20]. He is a certified prosthetist and orthotist trained to manage comprehensive orthotic and/or prosthetic patient care. [*Id.*] Mr. Bush saw Plaintiff one week later to deliver the CROW. [*Id.*; #55-4 at 25].

Plaintiff visited the local orthopedic clinic for a consult on May 29, 2013. [#55-1 at ¶ 21; #55-4 at 26-29]. Dr. Jacob Patterson examined Plaintiff and noted that he was essentially walking on the lateral side of his ankle and the deformity was not reducible. [*Id.*; #55-4 at 30]. Dr. Patterson opined that Plaintiff was likely to experience a break-down of skin, consequent ulceration and infection, and would ultimately require amputation of his foot if reconstruction was not attempted. [*Id.*] Dr. Patterson did not have the expertise to perform the surgery and recommended sending Plaintiff to a foot and ankle specialist. [*Id.*]

On June 4, 2013, Dr. Santini met with Plaintiff to discuss Dr. Patterson's report. Plaintiff complained of stabbing and shooting pain in his right foot and reported muscle spasms that occurred in the middle of the night. He requested a prescription for Neurontin. [#55-1 at ¶ 22; #55-4 at 31-34]. Defendant Santini prescribed Neurontin and noted in Plaintiff's file that surgical repair had been recommended.

On June 27, 2013, Mr. Bush saw Plaintiff for a follow up regarding the CROW, and noted pressure on the lateral malleoli and Plaintiff's request for additional padding in the boot. [#55-1 at ¶ 23; #55-4 at 36]. Plaintiff retrieved the orthotic boot with additional padding on July

11, 2013.  He reported no complaints but asked when his surgery would be scheduled.  [#55-1 at ¶ 24; #55-4 at 37].  Mr. Bush saw Plaintiff on July 25, 2013 regarding the boot, and again on July 31, 2013 to provide additional padding.  [#55-1 at ¶¶ 26, 27; #55-4 at 42-43].  On August 22, 2013, the URC referred Plaintiff's request regarding an orthopedic consult to "the Regional Office for final approval," with the notation that he should be notified of his status within two months.  [#55-1 at ¶ 28; #55-4 at 46].

Defendant Santini examined Plaintiff on September 11, 2013 to follow up regarding Plaintiff's bilateral foot pain.  He noted "erythema at the contact sites," increased Plaintiff's pain medication prescription, and scheduled him for a chronic care visit for December 2013.  [#55-1 at ¶ 29; #55-4 at 47-48].  Defendant Santini saw Plaintiff next on December 11, 2013.  Plaintiff reported that the pain had worsened and requested a repeat consultation with a foot and ankle specialist.  Plaintiff and Defendant also discussed a lawsuit Plaintiff had recently filed. Defendant Santini noted Plaintiff's right foot as "a grossly varus foot with erythema at the contact points with ambulation."  [#55-1 at ¶ 30; #55-4 at 49-51].  Defendant prescribed ibuprofen and increased Plaintiff's Gabapentin dosage, submitted a second request for an orthopedic surgical consult, and scheduled Plaintiff for a follow up appointment in one month. [*Id.*].  This was the last time Defendant Santini saw Plaintiff.  In January 2014, Dr. David Oba was assigned to FCI Florence and assumed responsibility for the medical care provided to inmates at that facility.  Dr. Santini was simultaneously assigned to the medical care of inmates housed at ADX, and his FCI files were transferred to Dr. Oba.[4]  [#55-1 at ¶ 31].

---

[4] Defendant Santini represents that the change in assignments was not related to Plaintiff's care. [#55-1 at ¶ 31].

Plaintiff's medical file indicates that he visited Dr. Oba in the Chronic Care Clinic on March 7, 2014, and reported that the foot orthotics for his Charcot joints were breaking down, he had lost over 70 pounds using the orthotics along with diet and exercise, consequently there was too much room in the newer orthotics, and he was waiting for a determination regarding reconstructive surgery on his right foot.  [#55-1 at ¶ 33; #55-4 at 53-54].  Plaintiff also reported significant bilateral foot pain despite taking the maximum dose of Gabapentin.  [*Id.*]  Following an examination of Plaintiff, Dr. Oba renewed the prescription for Gabapentin and Levetiracetam. [#55-1 at ¶ 33].  Plaintiff saw Mr. Bush on March 19, 2014 and stated that he did not want the new boot and would continue to use his old boot.  [#55-1 at ¶ 34; #55-4 at 55].

On March 27, 2014, Plaintiff underwent an orthopedic evaluation by Dr. Keith Minihane, who observed that Plaintiff had a severe varus deformity with nearly 90 degrees of angulation at the tibiotalar joint, superficial ulceration but no erythema, and the deformity was not correctable with passive stretch or manipulation.  Dr. Minihane also noted that Plaintiff "is not able to ambulate without his orthosis, but with his orthosis, he is an independent ambulator with a moderately antalgic gait."   [#55-4 at 58].   Dr. Minihane observed that Plaintiff required "operative intervention" of the sort outside of his scope of practice, and recommended referring Plaintiff to a foot and ankle specialist "who is able to perform complex foot reconstructions to include tendon transfers, osteotomies and arthrodesis."  [*Id.*]  Finally, Dr. Minihane cautioned that time was of the essence due to the "concern for further breakdown of the skin over the lateral aspect of [Plaintiff's] mid foot," and that if further break down occurred and infection ensued, "it would significantly compromise any reconstructive efforts and could possibly lead to the necessity for foot or below-knee amputation."  [#54-4 at 58-59].

14

Dr. Oba received Dr. Minihane's report on April 3, 2014 and saw Plaintiff in the Chronic Care Clinic the following day to discuss the doctor's observations and recommendations. [#54-4 at 60-62].   Dr. Oba noted in Plaintiff's file that "[t]wo orthopedists locally have both said [Plaintiff] needs reconstruction of the foot.  Such surgery is outside the scope of their practices." [*Id.* at 61].  Finally, Dr. Oba noted that Plaintiff "Will Be Placed on Callout."  [*Id.* at 62].

Defendant Santini represents in his declaration that Dr. Oba wrote a referral to a subspecialist with the recommendation that an appointment occur as soon as possible, and that:

> a request for a transfer to a facility that can accommodate Level 3 or 4 medical conditions has been initiated and routed for approval and signature.  This is due to the two opinions rendered by orthopedic surgeons who state the plaintiff is in need of surgery to correct his right foot and ankle deformity…

[#55-1 at ¶¶ 36, 37].  Finally, Defendant Santini states that requests for transfer based on medical reasons must be approved by the Central Office Medical Designator, Office of Medical Designations and Transportation ("OMDT").  [*Id.* at ¶ 38].

<u>Alicia Vineyard</u>

Defendant Vineyard is a Mid-Level Provider at FCI Florence.  [#55-5 at ¶¶ 1, 3].  Mid-Level Providers are graduate physician assistants, nurse practitioners, and unlicensed medical graduates.  [#55-5 at ¶ 4].  Defendant is not qualified to provide physical therapy or perform surgery, and does not have the expertise to determine whether Plaintiff required surgery.  [*Id.* at ¶ 7].  Defendant Vineyard was assigned to Plaintiff as a primary care provider, and Defendant Santini assumed responsibility for monitoring and managing Plaintiff's care as it related to CMT. [*Id.* at ¶ 11].  Defendant Vineyard arranged several visits between Plaintiff and an orthotist for Plaintiff to receive an orthotic boot.  [*Id.*]  Defendant Vineyard also scheduled follow up appointments for Plaintiff to meet with Defendant Santini.  [*Id.* at ¶ 21].

Defendant Vineyard denies that she stated to Plaintiff he arrived at FCI with "the problem" and would "leave with the problem." [#55-5 at ¶ 33]. She further represents that she is not responsible for scheduling appointments for outside consults and does not monitor whether appointments are scheduled or occur. [*Id.*]

Theresa K. Cozza-Rhodes

Defendant Cozza-Rhodes, Warden of FCI Florence, does not have medical training. She does not schedule surgery for inmates or medical appointments with outside providers, nor does she monitor the scheduling of medical appointments with outside providers. [55-8 at ¶ 3]. Defendant Cozza-Rhodes relies "upon the determinations of medical staff whether an inmate can be appropriately managed at [FCI Florence] or whether an inmate requires specialized medical care that can only be provided at a care level 3 or 4 facility." [*Id.* at ¶ 4].

Plaintiff pursued an administrative remedy in April 2013, alleging that FCI Florence medical staff were acting with deliberate indifference to his medical condition and requests for surgery and transfer to a medical facility. Defendant Cozza-Rhodes responded that the staff were appropriately managing his medical condition, that he was scheduled for an orthopedic consult to determine if surgery was medically necessary, and he did not meet the criteria at that time to be transferred to a medical center. [#55-8 at ¶ 5; #55-9 at 2]. She represents that she was not aware Plaintiff required surgery or physical therapy, and that at the time Plaintiff filed his administrative remedy, no doctor had yet recommended physical therapy or surgery. [#55-8 at ¶ 7]. Moreover, "[a]t no time relevant to Plaintiff's claims did any Bureau staff member inform [her] that it was their opinion or recommendation that Plaintiff needed to be transferred to a

16

higher-level care facility." [*Id.* at ¶ 9]. Medical staff submit requests for a medical re-designation through the OMDT. [#55-8 at ¶ 6; #55-10 at 5-7].

<u>Peter Bludworth</u>

Defendant Bludworth, Associate Warden of FCI Florence, does not have medical training. He does not schedule medical appointments with outside providers, schedule surgery for inmates, or monitor the scheduling of medical appointments with outside providers. [#55-11 at ¶ 3]. As with Defendant Cozza-Rhodes, Defendant Bludworth relies upon the determinations of medical staff whether an inmate can be properly cared for at FCI Florence or requires transfer to a different facility. [*Id.* at ¶ 4]. Defendant represents that he was unaware Plaintiff required surgery or physical therapy, and does not recall denying Plaintiff's request for a transfer. [*Id.* at ¶¶ 6, 8].

**ANALYSIS**

Plaintiff asserts three claims for violation of his Eighth Amendment rights. First, he claims that Defendants Santini and Vineyard failed to fulfill their gatekeeper roles when they failed to facilitate the reconstructive surgery he required. [#8 at 10]. Second, Plaintiff claims that all Defendants failed to fulfill their gatekeeper roles by not accommodating his need for physical therapy. [*Id.* at 13]. Finally, Plaintiff claims Defendant Santini acted with deliberate indifference in not providing adequate pain medicine. Defendants argue that Plaintiff cannot establish they were deliberately indifferent to his medical needs or that Defendants Cozza-Rhodes and Bludworth personally participated in a constitutional deprivation, and assert entitlement to qualified immunity. [#55].

The doctrine of qualified immunity provides "officials performing discretionary function[s], generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Qualified immunity is an affirmative defense to *Bivens* liability. *See Johnson v. Fankell*, 520 U.S. 911, 914 (1997). Once a defendant asserts the defense, the plaintiff must demonstrate that qualified immunity is not proper by showing that "(1) the defendant's conduct violated a constitutional right and (2) the law governing the conduct was clearly established at the time of the alleged violation." *DeSpain v. Uphoff*, 264 F.3d 965, 971 (10th Cir. 2001) (quoting *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1255 (10th Cir. 1998)). Therefore, the proper inquiry is whether the wrongs alleged by Plaintiff, *i.e.*, that Defendants did not schedule him for surgery or facilitate physical therapy, transfer him, or adequately provide for his pain, are cognizable constitutional violations under the Eighth Amendment.

In *Bivens,* 403 U.S. at 397, the United States Supreme Court recognized an implied cause of action for damages against federal officers alleged to have violated the prisoner petitioner's Fourth Amendment rights. Since then, the Supreme Court has found the same remedy available for violations of an individual's rights under the Cruel and Unusual Punishment Clause of the Eighth Amendment and the Due Process Clause of the Fifth Amendment. *See Carlson v. Green*, 446 U.S. 14 (1980); *Davis v. Passman*, 442 U.S. 228 (1979). A *Bivens* action is available only against government actors in their individual capacities. *See Hatten v. White,* 275 F.3d 1208, 1210 (10th Cir. 2002).

18

"[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (citation omitted).  The Eighth Amendment prohibits "unnecessary and wanton infliction of pain," including "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976).  Prison officials may be liable for an Eighth Amendment violation for "indifference…manifested…in their response to the prisoner's needs or by…intentionally denying or delaying access to medical care or intentionally interfering with treatment once prescribed." *Estate of Booker v. Gomez*, 745 F.3d 405, 429 (10th Cir. 2014).

"The test for constitutional liability of prison officials involves both an objective and a subjective component." *Mata v. Saiz,* 427 F.3d 745, 751 (10th Cir. 2005) (internal quotations and citation omitted).  First, the prisoner must "produce objective evidence that the deprivation at issue was in fact 'sufficiently serious.'"  *Id.* (quoting  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  "[A] medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Mata*, 427 F.3d at 751 (holding that even a physician's grossly negligent medical judgment is not subject to scrutiny if the prisoner's need for medical treatment was not obvious) (internal quotations and citation omitted).  Furthermore, a delay in medical care "only constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm." *Oxendine v. Kaplan,* 241 F.3d 1272, 1276 (10th Cir. 2001) (quotations and citation omitted).  The substantial harm requirement "may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Garrett v. Stratman,* 254 F.3d 946, 950 (10th Cir. 2001) (citation omitted).

19

Second, under the subjective component, the prisoner must establish deliberate indifference to his serious medical needs by "present[ing] evidence of the prison official's culpable state of mind." *Mata*, 427 F.3d at 751. "Deliberate indifference to serious medical needs of prisoners constitutes unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 104 (internal quotation and citation omitted). The Tenth Circuit recognizes two types of conduct constituting deliberate indifference. The first occurs when a medical professional fails to properly treat a serious medical condition; the second occurs when a prison official prevents an inmate from receiving treatment or denies him access to medical personnel capable of providing treatment. *See Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000) (internal citations omitted). A prison health official who serves "'solely…as a gatekeeper for other medical personnel capable of treating the condition' may be held liable under the deliberate indifference standard if she 'delays or refuses to fulfill the gatekeeper role.'" *Mata*, 427 F.3d at 751 (quoting *Sealock*, 218 F.3d at 1211. The subjective standard requires a state of mind "akin to recklessness in the criminal law, where, to act recklessly, a person must consciously disregard a substantial risk of serious harm." *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006) (quoting *Farmer*, 511 U.S. at 837) (internal quotations and further citation omitted). "'[A]n inadvertent failure to provide adequate medical care' does not rise to a constitutional violation." *Martinez v. Beggs,* 563 F.3d 1082, 1088 (10th Cir. 2009) (quoting *Estelle,* 429 U.S. at 105–06). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Self*, 439 F.3d at 1231 (internal quotations omitted). Finally, the plaintiff must allege that defendants

personally participated in the Eighth Amendment violation.  *See Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996) (citing *Bennett v. Passic*, 545 F.2d 1260, 1262-63 (10th Cir. 1976)).

Defendants challenge Mr. Johnson's ability to satisfy either prong of the constitutional analysis.

## I.     Objective Prong

First, Defendants dispute that Plaintiff had a sufficiently serious medical condition to objectively establish an Eighth Amendment violation.  [#55 at 13].  But Defendants' own evidence demonstrates that Plaintiff complained of suffering ongoing and increasing pain beginning July 18, 2012, complained of on October 22, 2012, again on June 4, 2013 and finally on December 11, 2013 [#55-7 at 37-39, 40-42, 43-45, 48-51]; and two medical specialists recommended that he undergo reconstructive surgery as soon as possible.  [#54-4 at 30, 58-59]. Defendants' argument that Plaintiff entered FCI Florence with a congenital condition and Dr. Santini did not cause Plaintiff additional "harm or [] serious injury that required medical care" is unpersuasive.  Defendants, having cited the applicable law in their Motion, simply ignore that "a medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment."  *Mata*, 427 F.3d at 751.  And a delay in medical care can constitute an Eighth Amendment violation where the delay resulted in substantial harm, such as considerable pain.  *See Garrett*, 254 F.3d at 950.  I find that Defendants have failed to establish that there is no genuine issue of material fact that Plaintiff has demonstrated the first, objective prong of the Eighth Amendment inquiry.

II.     **Subjective Prong**

However, this court concludes that Mr. Johnson cannot prevail on an Eighth Amendment violation because he has not demonstrated that there is a genuine issue of material fact with respect to the prong that requires him to prove deliberate indifference.   More specifically, Plaintiff has not established facts to show that Defendants delayed or refused to fulfill their gatekeeper role.

A.     **Deliberate Indifference**

In April 2012, two months after he arrived at FCI Florence, Plaintiff reported for the first time that he was experiencing pain deriving from his feet and he asked for foot surgery.  [#55-1 at ¶ 16; #55-4 at 11-13].  At this time, Defendant Santini renewed Plaintiff's exemptions, which included a lower bunk, soft shoes, and crutches [*id.*], and he discussed Plaintiff's condition with an orthopedic surgeon, who recommended that an orthotist evaluate Plaintiff for boot placement. [#55-1 at ¶ 17; #55-4 at 14-16].  The URC approved Plaintiff for a prosthetics device on June 14, 2012.  [#55-4 at 17].  Six months later, on January 24, 2013, Mr. Bush examined Plaintiff, fit him for an orthotic boot, and delivered the CROW one week later.  [#55-4 at 24, 25].  Defendant Santini had no control over when Plaintiff was scheduled to see Mr. Bush.  [#55-1 at ¶ 8].

On May 29, 2013, Dr. Patterson examined Plaintiff at the local orthopedic clinic and recommended reconstructive surgery before the affected skin broke down further, resulted in infection, and necessitated amputation of Plaintiff's foot.  [#55-4 at 26-30].  Defendant Santini and Plaintiff met on June 4, 2013 to discuss Dr. Patterson's report, and Defendant noted the surgical repair recommendation in Plaintiff's file.  [#55-4 at 31-34].  On August 22, 2013, the URC referred Plaintiff's request for an orthopedic consult to "the Regional Office for final

approval" with the notation that he should be notified of his status within two months.  [#55-1 at ¶ 28; #55-4 at 46].   Plaintiff saw Defendant Santini in September 2013, at which time Santini increased Plaintiff's pain medication and scheduled him for a follow up visit in December.  On December 11, 2013, Plaintiff reported that his pain had worsened and asked again for a consultation with a foot and ankle specialist.   Dr. Santini prescribed ibuprofen, increased Plaintiff's Gabapentin dosage, submitted a second request for an orthopedic surgical consult, and scheduled Plaintiff for a follow up appointment in one month.  [#55-4 at 49-51].   Thereafter, Defendant Santini was reassigned to ADX and his patients were transferred to the care of Dr. Oba.

This record does not demonstrate that Dr. Santini failed to satisfy his gatekeeper role.  He notated Plaintiff's file with the surgical recommendations and submitted requests for consults on Plaintiff's behalf.   He was not a member of the Regional Office and did not have authority as staff physician to order or otherwise schedule Plaintiff for an orthopedic surgical consult.  Furthermore, the evidence does not indicate that Defendant Santini acted with reckless indifference to Plaintiff's medical needs.   Between February 2012 and December 2013, Defendant Santini saw Plaintiff approximately nine times.  [#55-1 at ¶¶ 11, 13, 14, 16, 18, 19, 22, 23, 29, 30].   Defendant Santini monitored Plaintiff's use of the orthotic boot and CROW, routinely examined Plaintiff's feet, and renewed prescriptions for pain medication or wrote prescriptions for new pain medication pursuant to Plaintiff's complaints. [#55-1 at ¶¶ 18, 19, 22, 29].   Plaintiff's dosage increased to the point where he ultimately received the maximum allowance of pain medication.  [#55-5 at ¶ 35; #55-7 at 46-47, 48-50, 51].  Because Mr. Johnson

failed to submit a response with any evidence to contest the facts as set forth by Dr. Santini, the court finds that summary judgment is appropriate.

I similarly find that Defendant Vineyard did not fail to satisfy her gatekeeper role with respect to Plaintiff.  She served as Plaintiff's primary care provider and, due to the complexity of his condition, was not involved in the treatment of the CMT and did not evaluate Plaintiff in the Chronic Care Clinic.  [#55-5 at ¶ 11].  Defendant Vineyard was not authorized to schedule appointments for Plaintiff with outside providers and had no control over the final authority required from the Regional Office.  Again, based on the uncontroverted facts before the court, I find that summary judgment with respect to Defendant Vineyard is warranted.

Finally, with respect to Plaintiff's Second Claim for relief, FCI Florence as a Level II facility does not offer physical therapy services.  Plaintiff alleges that Mr. Bush ordered him on March 26, 2013 to participate in physical therapy to properly utilize the CROW.  [#8 at 13]. Defendant Vineyard acknowledges that Mr. Bush "did suggest therapy might assist the plaintiff with learning how to use his CROW, however he did not indicate this was medically necessary," and, moreover, Mr. Bush is not a physician.  [#55-5 at ¶¶ 31, 32].  The record does not include a recommendation from Mr. Bush regarding physical therapy.   As to Plaintiff's claim that Defendants should have ordered his transfer, medical staff submit requests for transfer based on medical reasons through OMDT for approval.  Defendant Santini stopped attending to Plaintiff three months after the URC stated that Regional Office approval was required and the status of that approval was forthcoming, and immediately after he submitted a second request for a special consult.  Defendant Vineyard was never responsible for Plaintiff's care with respect to CMT. Defendant Cozza-Rhodes was alerted to Plaintiff's request to transfer prior to Dr. Patterson's

recommendations and attests that medical staff never informed her that Plaintiff should be transferred. [#55-8 at ¶¶ 7-9].   Similarly, Defendant Bludworth attests that he was not aware of Plaintiff's need for surgery or desire for transfer, and does not recall denying a request to transfer. [#55-11].   Associate Warden Bludworth states that if he had denied a transfer, he "would have relied upon the recommendations of medical staff who are responsible for determining whether an inmate can be medically managed at [FCI] …"   [*Id.* at ¶ 8].   Within months of assuming responsibility for Plaintiff's care, and presumably after the Regional Office failed to approve a surgical consult, Dr. Oba requested that Plaintiff be transferred to a Level III or IV facility.   [#55-1 at ¶¶ 36, 37].   Plaintiff was indeed transferred on or before July 8, 2014. [#40].

The record before me does not support a finding that there is a genuine issue of material fact with respect to any deliberate indifference as to any Defendant.

### B.     Personal Participation

In addition to finding that Mr. Johnson failed to establish a genuine issue of material fact that Defendants acted with deliberate indifference with respect to Plaintiff's alleged physical therapy needs, I find insufficient evidence to establish that Defendants Cozza-Rhodes and Bludworth personally participated in the alleged constitutional deprivation.   The Amended Complaint alleges that these Defendants could have accommodated Plaintiff's need for physical therapy by contracting with a physical therapist to provide services to FCI Florence or by authorizing his transfer to a different facility.   [#8 at 13-14].   Plaintiff did not file a Response to the Motion for Summary Judgment and thus has offered no evidentiary support for these assertions.   In contrast, Defendants Cozza-Rhodes and Bludworth attest that their facility by

definition does not provide physical therapy services, requests for transfers are submitted through OMDT by medical staff, and none of their medical staff alerted them to Plaintiff's medical needs.  [#55-8 at ¶¶ 7-9; #55-11 at ¶¶ 5-8].  Plaintiff has not established any facts, if true, to support personal participation by the Warden and Associate Warden.  *See Davis v. Arkansas Valley Corr. Facility,* 99 Fed. Appx. 838, 843 (10th Cir. 2004) (holding defendant warden was not implicated under § 1983 merely because plaintiff copied him on correspondence outlining complaints about medical care); *see also Crowder v. Lash*, 687 F.2d 996, 1005-6 (7th Cir. 1982) (rejecting theory that defendant prison official should be held liable for constitutional violations on the basis that plaintiff had informed him personally and by letter of the "deprivations [plaintiff] had encountered."); *Doyle v. Cella,* No. 07–cv–01126–WDM–KMT, 2008 WL 4490111, at *2 (D. Colo. Sept. 30, 2008) (finding plaintiff's allegation that defendant warden was "made aware" of constitutional violations insufficient to establish personal participation of the defendant); *Watson v. McGinnis,* 964 F. Supp. 127, 130 (S.D.N.Y. 1997) ("The law is clear that allegations that an official ignored a prisoner's letter are insufficient to establish liability.") (internal citations omitted).  Therefore, summary judgment is appropriate with respect to Warden Cozza-Rhodes and Associate Warden Bludworth for the separate reason that Plaintiff fails to establish that there is a genuine issue of material fact with respect to their lack of personal participation in the alleged constitutional violation.

## CONCLUSION

For the foregoing reasons, this court RECOMMENDS that Defendants' Motion for Summary Judgment [#55] be GRANTED in its entirety.[5]


DATED: July 27, 2015                    BY THE COURT:


                                        s/Nina Y. Wang_____
                                        United States Magistrate Judge

---

[5] Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the District Court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Property Known As 2121 East 30th Street, Tulsa, Oklahoma*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the District Judge of the Magistrate Judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (District Court's decision to review a Magistrate Judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *International Surplus Lines Insurance Co. v. Wyoming Coal Refining Systems, Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the Magistrate Judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the Magistrate Judge's ruling). *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).